25CA1269 Boulder Valley v Roetto 04-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1269
Office of Administrative Courts No. TC 2024-0002

---

Rebecca Roetto,

Respondent-Appellant,

v.

Boulder Valley School District,

Petitioner-Appellee,

and

Office of Administrative Courts,

Appellee.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE GOMEZ
Pawar and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 9, 2026

---

Euell Thomas, Denver, Colorado, for Respondent-Appellant

Semple, Farrington, Everall & Case, P.C., Holly Ortiz, Denver, Colorado, for Petitioner-Appellee

No Appearance for Appellee

¶ 1       Rebecca Roetto, who was employed for fifteen years as a teacher with the Boulder Valley School District, appeals the district school board's decision dismissing her for insubordination, neglect of duty, immorality, and other good and just cause.  Roetto argues that (1) the decision was arbitrary, capricious, or otherwise legally impermissible and (2) the admission of hearsay evidence at her administrative hearing requires reversal.  We disagree with her arguments and therefore affirm the school board's decision.

## I.    Background

¶ 2       The following facts are undisputed.

¶ 3       Roetto was a teacher at Fairview High School from 2009 to 2024.  During the 2023-2024 school year, she taught health and physical education classes.  At some point during the previous school year, she had received an informal discipline for failing to maintain appropriate student boundaries.

¶ 4       All Fairview graduating seniors were required to have their teachers sign a senior clearance form — an official school document — verifying that they had turned in all equipment, had paid all fees, and were cleared to graduate.  Teachers could verify

1

that a student met the graduation requirements for their class by signing the sheet or using a stamp.

¶ 5     During the last week of school in 2024, Roetto was signing senior clearance forms during an informal study hall.  Roetto asked her student aide to get a stamp from the office; the aide returned upset because she was unable to obtain one.  To ease the tension, Roetto asked the student if she could draw a picture instead.  The student requested a penis, and Roetto drew one.

¶ 6     Roetto then gave other seniors the option of having her draw a flower, a sunshine, a star, or a penis on their forms.  Roetto admitted to drawing a penis on nine students' senior clearance forms and in one student's yearbook.

¶ 7     One student reported the drawing on her senior clearance form to a staff member, who made a report to the administration. The student discussed the incident with school personnel and submitted a written report about it.  She said she felt uncomfortable after the incident, and, upon her request, she was excused from her last three days of classes with Roetto.

¶ 8     On the day of the incident, Dr. Scarlett Chopin, the principal at Fairview, was made aware of the drawings and immediately went

2

to Roetto's office. Before Dr. Chopin could speak, Roetto admitted to the drawings, apologized, and said she wouldn't do it again. Dr. Chopin verbally directed Roetto not to make any more penis drawings, and she didn't make any more after that.

¶ 9    A few days later, Dr. Chopin gave Roetto a nondisciplinary letter of expectation regarding the incident. Roetto completed the school year, receiving an award for her "tireless[] support[]" and service as "a trusted adult" for her students. No investigation was initiated before or during the summer break.

¶ 10    Just before the start of the next school year, Roetto was placed on administrative leave pending an investigation into the incident. That investigation included interviewing Roetto, Dr. Chopin, and five other staff members. Although the staff interviews included summaries of their conversations with the complaining student and other students, no students were interviewed as part of the investigation. In her interview, Roetto admitted to making the penis drawings, but she denied being aware of any student who was uncomfortable with them. Roetto also confirmed that she was aware of school district policies GBEB-R, JBB, and GBAA.

¶ 11 District policy GBEB-R pertains to professional boundaries with students. It provides, in relevant part:

> All district employees are expected to observe and maintain proper professional boundaries, in accordance with this regulation and accompanying policy.
>
> . . . .
>
> Prohibited communication[] . . . by a staff member with a student includes, but is not limited to . . . sexual jokes, notes, drawings, . . . or pictures [and] displaying or transmitting sexual pictures, objects or depictions . . . .
>
> . . . .
>
> In determining whether a violation of professional boundaries has occurred, the district shall consider the totality of the circumstances, including the nature and extent of the conduct involved, the job description and duties of the employee, the employee's intent or purpose in engaging in the conduct, and whether the conduct caused harm to the student or adversely affected the education of students.

¶ 12 District policy JBB pertains to sexual harassment. As relevant here, it provides the following:

> It shall be a violation of policy for any staff member to harass students . . . through conduct or communications of a sexual nature . . . .

4

. . . .

[N]on-verbal or physical conduct of a sexual nature may constitute sexual harassment . . . when . . . [s]uch conduct is sufficiently severe, persistent or pervasive such that it limits a student's ability to participate in or benefit from an education program . . . or it creates a hostile or abusive educational environment. For a one-time incident to rise to the level of harassment, it must be severe.

Any conduct of a sexual nature directed . . . by a staff member to a student is presumed to be unwelcome and shall constitute sexual harassment.

. . . .

In determining whether [particular] conduct constitutes sexual harassment, [the district shall investigate] the totality of the circumstances, the nature of the conduct, and the context in which the . . . conduct occurred . . . .

¶ 13    District policy GBAA provides, in part:

It shall be a violation of policy for any member of the district staff to harass . . . [a] student through conduct or communications of a sexual nature. . . .

. . . .

[U]nwelcome conduct of a sexual nature constitutes sexual harassment if . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's . . . educational performance or

> creating an intimidating, hostile or offensive . . . educational environment.
>
> . . . .
>
> Sexual harassment . . . may include but is not limited to . . . [s]ex-oriented verbal "kidding," abuse or harassment.
>
> . . . .
>
> All reports of sexual harassment received by any district employee shall be promptly forwarded to the compliance officer . . . [who] shall ensure that every complaint is promptly investigated . . . .

¶ 14   Another district policy — policy AC — also requires the district to "promptly . . . investigate allegations of . . . harassment."

¶ 15   After the investigation, the district superintendent recommended Roetto's dismissal on the grounds of insubordination, neglect of duty, immorality, and other good and just cause. Roetto objected, and the matter proceeded to a hearing before an administrative law judge (ALJ) pursuant to section 22-63-302(4)(a), C.R.S. 2025.

¶ 16   Following a three-day hearing, the ALJ entered an order detailing his findings of fact and conclusions of law. The ALJ recommended that Roetto be retained as a teacher because the

school district had failed to meet its burden to establish any of the four cited grounds for dismissal.

¶ 17   Disagreeing with the ALJ's recommendation, the school board adopted the ALJ's findings but determined that Roetto's conduct met all four grounds for dismissal — insubordination, neglect of duty, immorality, and other good and just cause.  Accordingly, the school board discharged Roetto.

## II.   Grounds for Dismissal

¶ 18   Roetto first contends that the school board's decision dismissing her was arbitrary, capricious, or otherwise legally impermissible.  We aren't persuaded.  In our review, we first set forth the relevant legal standards and then consider each of the four grounds the board cited in its decision.  The board asserts that any of the four grounds can support the dismissal, so it is sufficient if they prevail on only one of them.  Nonetheless, because it's not clear to us whether the board based its dismissal decision on all four grounds collectively, or whether it might have taken a different action if it had considered only three or fewer of the grounds, we consider all four of the cited grounds.

7

## A. Relevant Legal Standards

¶ 19 Under section 22-63-301, C.R.S. 2025, a teacher may be dismissed for a number of reasons, including insubordination, neglect of duty, immorality, and other good and just cause. If a school administrator recommends dismissal on one or more of these grounds and the teacher objects, the matter proceeds to a hearing, at which the administrator has the burden of establishing the grounds for dismissal. § 22-63-302(2)-(4), (8). Following the hearing, the hearing officer or ALJ issues written factual findings and a recommendation. § 22-63-302(8). The matter then goes to the school district's board of education for a final written decision. § 22-63-302(9). If, as in this case, the school board chooses to dismiss the teacher over an ALJ's retention recommendation, its decision must include "a conclusion, giving its reasons therefor, which must be supported by the [ALJ's] findings of fact." *Id.*

¶ 20 Any teacher dismissed under these provisions may file an action for review of the school board's decision in this court. § 22-63-302(10)(a). Our role then is to "determine whether the action of the board was arbitrary or capricious or was legally

8

impermissible" based upon the record before the ALJ.  § 22-63-302(10)(c); *see Ritzert v. Bd. of Educ.*, 2015 CO 66, ¶ 26.

¶ 21     While the school board is bound by the ALJ's findings of evidentiary fact so long as those findings are supported by the record, it is not bound by the ALJ's recommendation and may issue its own findings of ultimate fact applying the facts to the law and settling the parties' rights and liabilities.  *Ritzert*, ¶¶ 24, 30; *Bd. of Educ. v. Flaming*, 938 P.2d 151, 157-58 (Colo. 1997).  To survive arbitrary and capricious review, a school board's findings of ultimate fact must be "fully warranted" by the ALJ's findings of evidentiary fact.  *Ritzert*, ¶ 27 (citations omitted).

¶ 22     Findings of ultimate fact are the "exclusive prerogative" of the school board, and "a reviewing court may not freely substitute its comparatively uninformed judgment for the board's experienced appraisal of the harm inflicted on the school community by particular instances of a teacher's conduct."  *Ricci v. Davis*, 627 P.2d 1111, 1118 (Colo. 1981); *accord Flaming*, 938 P.2d at 158.  Thus, we will uphold a school board's application of the dismissal criteria to a specific instance of teacher conduct if its decision "is

warranted in the record and has a reasonable basis in law." *Ricci,* 627 P.2d at 1119.

## B. Insubordination

¶ 23 Insubordination within the meaning of section 22-63-301 is the willful or intentional refusal to obey a superior's reasonable order. *Ritzert,* ¶ 29. It only requires intentional conduct in violation of a superior's directive — not a specific intent to violate such a directive. *Flaming,* 938 P.2d at 159. Even a single instance of violating a directive can amount to insubordination justifying dismissal under the statute. *Ware v. Morgan Cnty. Sch. Dist. No. RE-3,* 748 P.2d 1295, 1300 (Colo. 1988); *Sch. Dist. No. 1 v. Cornish,* 58 P.3d 1091, 1095 (Colo. App. 2002).

¶ 24 In his recommendation, the ALJ suggested that Roetto's conduct didn't amount to insubordination because there was no evidence that she made the drawings with the conscious or willful purpose of contravening district policies. Instead, the ALJ said, she made them "to lighten the mood" and because she got "caught up in the humor." The ALJ also noted that Roetto didn't violate any specific directive not to draw penises on school documents and that

10

she didn't draw any more penises after receiving Dr. Chopin's verbal directive and written letter of expectation.

¶ 25     The school board rejected that recommendation, determining that Roetto's conduct constituted insubordination because she "knowingly drew penises on ten students' official papers, including one student's yearbook," and she was admittedly aware of the relevant district policies and had in the past been informally disciplined for failing to maintain appropriate student boundaries. Thus, the board concluded, Roetto "engaged in insubordination by knowingly violating [district] policies on professional boundaries and harassment."

¶ 26     Roetto argues that the ALJ got it right — that there was no evidence that she willfully violated any policy or directive, as she was merely aware of the relevant policies but didn't actually intend to violate any of them, she hadn't received any specific directives before she made the drawings, and she ceased the conduct as soon as she was told to do so.

¶ 27     But specific intent to violate a directive isn't necessary, so long as the underlying conduct is intentional. *Flaming*, 938 P.2d at 159. Indeed, in *Flaming*, the supreme court expressly rejected a standard

for insubordination that would've required the conduct to have been "deliberately executed with the purpose of contravening prior directives." *Id.* at 158. Thus, in some instances, it is sufficient that a teacher engaged in intentional conduct that violated a prior directive or a known policy. *See id.* at 159 (the evidence supported the school board's finding of insubordination when, among other things, a teacher engaged in conduct that violated school and district policies, she'd previously been disciplined for violating such policies, and she'd been told that failure to follow the policies would be considered insubordination).

¶ 28 Whether a teacher's conduct in a particular instance amounts to insubordination is a question of ultimate fact for a school board to resolve. *Ritzert*, ¶ 32. Thus, here, the school board was free to reject the hearing officer's recommendation that Roetto's conduct didn't constitute insubordination. *See Flaming*, 938 P.2d at 158. To be sure, the board was bound by the hearing officer's findings of evidentiary fact — such as the findings that Roetto drew penises on nine students' senior clearance forms and in one student's yearbook and that one student complained about the drawings. *See Ritzert*, ¶ 24. Indeed, the board adopted all those findings.

12

¶ 29    And the board reasonably concluded, based on those findings, that Roetto engaged in intentional conduct that violated district policies.  Roetto's drawing of penises on student forms, leading one student to express discomfort and ask to be excused from Roetto's class for the rest of the year, could constitute a violation of student boundaries under policy GBEB-R, which prohibits communications from a staff member to a student that include "sexual . . . drawings" or "display[s] or transmi[ssion of] sexual pictures, objects or depictions."  It also could constitute sexual harassment under policy JBB, which prohibits "[a]ny conduct of a sexual nature" that is "directed . . . by a staff member to a student" or that "limits a student's ability to participate in or benefit from an education program" or "creates a hostile or abusive educational environment." And it could constitute sexual harassment under policy GBAA, which prohibits "[s]ex-oriented verbal 'kidding,' abuse or harassment" as well as "unwelcome conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's . . . educational performance or creating an intimidating, hostile or offensive . . . educational environment."

13

¶ 30    Because the board reasonably determined that Roetto violated district policies and because, as the board noted, Roetto was aware of those policies and had been informally disciplined for failing to maintain professional boundaries in the past, the board's ultimate finding of insubordination is fully warranted by the ALJ's findings of evidentiary fact.  Accordingly, we conclude that Roetto hasn't shown that the board's ultimate insubordination finding was arbitrary, capricious, or otherwise legally impermissible.

## C.    Neglect of Duty

¶ 31    Neglect of duty occurs when a teacher fails to carry out their obligations and responsibilities in connection with classroom and other school sponsored activities, including by failing to comply with school policies.  *Flaming*, 938 P.2d at 159; *Blaine v. Moffat Cnty. Sch. Dist. Re No. 1*, 748 P.2d 1280, 1292-93 (Colo. 1988).

¶ 32    The ALJ recommended finding that there was no neglect of duty because Roetto hadn't violated the relevant policies.  More specifically, the ALJ suggested there was no violation of professional boundaries and no sexual harassment when considering the totality of the circumstances, including the facts that Roetto made her first penis drawing because a student had requested it, she made the

14

other drawings after students who were given a choice asked for a penis drawing, she intended the drawings to "lighten the mood" and not to be sexual or harass any students, the drawings occurred over a two-hour period near the end of the school year and involved seventeen- and eighteen-year-old graduating seniors, and only one student complained. The ALJ also submitted that the district hadn't promptly investigated the student complaint as required by policies GBAA and AC.

¶ 33     The school board disagreed, concluding that Roetto's conduct constituted neglect of duty because she "fail[ed] to comply with [district] policies" created to maintain a safe and secure learning environment and, "by doing so[,] negatively impacted the learning environments for [Fairview] students." The board further reasoned, "[It] expects that teachers will create learning environments that are free of harassment, including sexual harassment, and that they will maintain appropriate boundaries with students" and "expect[s] that students of all ages served by the [district] will have teachers who do not engage in conduct, like making drawings of genitalia, that is specifically prohibited by [district] [p]olicy."

¶ 34    As before, whether Roetto's conduct amounted to neglect of duty was a question of ultimate fact for the school board to resolve. *See Blaine*, 748 P.2d at 1292.  And, as before, the board's conclusion that Roetto violated district policies is both reasonable and supported by the ALJ's findings of evidentiary fact.

¶ 35    Roetto nonetheless raises two arguments challenging the board's decision.  First, she argues that the board failed to consider the totality of the circumstances, as required by policies GBEB-R and JBB.  But there is no indication that the board didn't consider the totality of the circumstances.  It simply focused on facts different from those the ALJ had highlighted, as was its prerogative. *See id.* (concluding that a school board "properly exercised its statutory prerogative when, after adopting the hearing officer's findings of evidentiary fact . . . , it nonetheless made a finding of ultimate fact that [a teacher] was guilty of neglect of duty and ordered her dismissal over the hearing officer's recommendation of retention").

¶ 36    And second, Roetto argues that the school district violated its own policies requiring a prompt investigation by delaying its investigation until the following school year.  But under the

16

circumstances of this case, we cannot say that the school board was bound by the ALJ's supposition that the district waited too long to start its investigation. While the board was bound by the underlying findings of evidentiary fact as to the timeline of events, the issue of whether the timing of the investigation was sufficiently "prompt" to comply with the policies is, at the very least, a mixed question of law and fact properly determined by the board. *See Ritzert*, ¶¶ 24, 30; *Flaming*, 938 P.2d at 157-58. And although we sympathize with Roetto's arguments that the district should have begun the investigation more promptly and should have interviewed the students involved, we cannot say as a matter of law that the board's resolution of this issue was arbitrary and capricious or otherwise contrary to law. Nor does Roetto explain what impact the district's failure to conduct a more timely or more thorough investigation might have had on the ultimate finding, based on the investigative results, that Roetto was subject to dismissal.

¶ 37   Accordingly, we conclude that Roetto has not shown that the school board's ultimate finding as to neglect of duty was arbitrary, capricious, or otherwise legally impermissible.

17

## D. Immorality

¶ 38    For purposes of section 22-63-301, immorality is conduct that indicates a teacher's unfitness to teach based on past harm or likely future harm to the school community. *Ricci*, 627 P.2d at 1117. In determining fitness to teach, a school board may consider the factors set out in *Weissman v. Board of Education*, including the age and maturity of the teacher's students, the likelihood that the teacher's conduct had an adverse effect on those students, the degree of that adversity, the proximity or remoteness in time of the conduct, any extenuating or aggravating circumstances surrounding the conduct, the likelihood the conduct may be repeated, the motives underlying the conduct, and the extent to which discipline may have a chilling effect upon the rights of the teacher or other teachers. 547 P.2d 1267, 1273 (Colo. 1976).

¶ 39    The ALJ recommended finding that Roetto's conduct didn't impact her fitness to teach. Considering the *Weissman* fitness-to-teach factors, the ALJ noted, among other things, that Roetto only offered the penis drawing to seniors who were seventeen or eighteen years old; the conduct was unlikely to be repeated; Roetto's intent was to be humorous; Roetto had been a teacher for twenty years

18

with only one informal disciplinary issue; the adverse impact on the complaining student was "minimal," as she was excused from her last three classes with Roetto before graduation; and there was no indication the conduct had impacted anyone else.

¶ 40 Nonetheless, the school board concluded that "statutory grounds exist[ed] to find [that Roetto] engaged in immorality by failing to comply with [district] policies and engaging in misconduct towards students that [wa]s likely to harm the school community." The board explained that, of the ten students who had Roetto draw penises on their papers, one said he wasn't bothered and one reported the conduct the same day and never went back to that class. The board further noted that it "[could] not assume that none of the other students were or that future students would not be adversely affected because of their age or because a teacher was trying to be humorous." The board also explained that "[s]tudents are entitled to learning environments free of harassing and potentially harmful conduct."

¶ 41 As with the other cited grounds, whether Roetto's conduct constituted immorality was a question of ultimate fact for the school board to resolve. *See Ricci,* 627 P.2d at 1118-19. And "[a]lthough

19

the determination . . . is subject to judicial review, considerable discretion is left in the [school board] to define the limits of such broad general grounds as . . . 'immorality[]' in the educational context." *Blair v. Lovett,* 582 P.2d 668, 672 (Colo. 1978).

¶ 42 Roetto contends that the school board failed to sufficiently explain the basis for its ultimate finding and failed to demonstrate that it considered the relevant factors. We disagree. The board explained that its primary concern was ensuring that students have a learning environment free of harassing and potentially harmful conduct. And as part of its reasoning, it referenced almost all the *Weissman* factors as follows:

- The age and maturity of the teacher's students and the likelihood that the teacher's conduct had an adverse effect on those students — The board said it couldn't assume that none of the eight students who received penis drawings and didn't say anything about them weren't adversely affected merely because of their age.

- The degree of any adversity — The board noted that while one student said he wasn't bothered by Roetto's conduct,

20

another student reported it and never went back to Roetto's class.

- The proximity or remoteness in time of the conduct — The board noted that the student who reported the incident did so on the very same day.

- Any extenuating or aggravating circumstances surrounding the conduct — The board highlighted that Roetto's conduct violated district policies.

- The likelihood the conduct may be repeated — The board didn't expressly consider whether Roetto might engage in similar conduct in the future, but it alluded to the potential harm that future students might suffer if she were to do so.

- The motives underlying the conduct — The board found that it couldn't discount the adverse effects of Roetto's conduct just because she was trying to be humorous.

*See Weissman*, 547 P.2d at 1273.

¶ 43    Although we are troubled by the board's speculation as to the potential adverse impact Roetto's conduct may have had on the eight students who were never asked about the penis drawings, we

21

acknowledge that the board found the investigation to be sufficient and that the board's ultimate finding on the issue of immorality relies on the relevant factors and is supported by the ALJ's findings of evidentiary fact. *See Ricci*, 627 P.2d at 1118; *Flaming*, 938 P.2d at 158. Accordingly, we conclude that Roetto has not shown that the board's ultimate immorality finding was arbitrary, capricious, or otherwise legally impermissible.

### E. Other Good and Just Cause

¶ 44 Other good and just cause includes any cause for dismissal that "bear[s] a reasonable relationship to [a] teacher's fitness to discharge [their] duties" or that "materially and substantially affects performance." *Flaming*, 938 P.2d at 159 (quoting *Fredrickson v. Denv. Pub. Sch Dist. No. 1*, 819 P.2d 1068, 1073 (Colo. App. 1991)). School boards may apply the *Weissman* fitness-to-teach factors in assessing other good and just cause. *Id.* at 160.

¶ 45 In his recommendation, the ALJ indicated his belief that Roetto's actions "d[id] not bear a reasonable relationship to her fitness to discharge her duties" and "d[id] not materially or substantially affect her performance."

¶ 46 Rejecting that recommendation, the school board concluded,

22

It is hard to understand how a teacher can discharge their duties to teach if a student finds the conduct sufficiently offensive to warrant not attending class for the rest of the school year, even if that only means a few days. All of our students deserve schools and classrooms that challenge them intellectually and academically, while supporting them emotionally. At a minimum, this means not being subjected to sexual harassment by a teacher and adult misconduct. The [b]oard finds that statutory grounds exist to find [Roetto's] conduct constitutes other good and just cause.

¶ 47 Again deferring to the school board's determination of the ultimate issue, we conclude that the evidentiary facts and the board's reasoning sufficiently support its decision. *See Flaming*, 938 P.2d at 160. As before, the board was justified in concluding that Roetto's conduct constituted sexual harassment within the meaning of district policy, in being concerned about the student who found the conduct sufficiently offensive to ask to be excused from Roetto's class for the rest of the school year (even though that was only a few days), and in endeavoring to create an environment where students are supported emotionally without being subjected to harassment and misconduct.

¶ 48    Therefore, we conclude Roetto has not shown that the school board's ultimate finding as to other good and just cause was arbitrary, capricious, or otherwise legally impermissible.

### III.    Hearsay Evidence

¶ 49    Roetto also contends that the ALJ's erroneous admission of hearsay evidence at the hearing warrants reversal.  We disagree.

¶ 50    "In a hearing of this nature, the rules of evidence are somewhat relaxed and hearsay testimony may be allowed." *Mondragon v. Poudre Sch. Dist. R-1*, 696 P.2d 831, 834 (Colo. App. 1984).  Moreover, "[r]eversal is proper only if . . . inadmissible hearsay is the sole evidence relied upon by the finder of fact." *Id.*

¶ 51    Roetto challenges the ALJ's admission of (1) an investigative report with summaries of witness interviews from the district's investigation and (2) an incident report written by the complaining student — who did not testify at the hearing — stating that Roetto drew a penis on her form and that she left the class afterward because she found the situation "very random and awkward."  Even assuming this evidence was erroneously admitted, Roetto hasn't shown that it warrants reversal.

¶ 52    In particular, as to the student's incident report, there is other, unchallenged evidence regarding the same facts.  Specifically, Dr. Chopin and the district employee relations investigator both testified at the hearing that the student reported Roetto's conduct and, upon request, was allowed not to return to Roetto's classroom for the remainder of the year.  Roetto also acknowledged that she drew a penis on the complaining student's paper and that the student didn't return to her class for the rest of the year.  And Roetto doesn't cite any other facts that she claims were presented through hearsay evidence that were not established through other admissible evidence at the hearing.

¶ 53    Thus, even if the ALJ erred by admitting the challenged evidence, there was substantial other evidence supporting the same facts.  Accordingly, Roetto hasn't shown that any error warrants reversal.  *See id.*; *see also Benke v. Neenan*, 658 P.2d 860, 862 (Colo. 1983) (even if the hearing officer erred by allowing hearsay

evidence, it was harmless because "there was ample, direct and substantial evidence to support" his factual findings).[1]

## IV.   Appellate Attorney Fees and Costs

¶ 54    Roetto requests reimbursement of her reasonable attorney fees and costs pursuant to section 22-63-302(e), which allows teachers to recover their fees and costs if they are ordered reinstated by this court and the nonprevailing party's defense on appeal lacked substantial justification.  Because we affirm the school board's dismissal, Roetto isn't entitled to an award of fees and costs under the statute.  Therefore, we deny her request.

## V.   Disposition

¶ 55    The order is affirmed.

JUDGE PAWAR and JUDGE JOHNSON concur.

---

[1] We decline to consider Roetto's argument concerning violation of the Confrontation Clause, as she neither develops the argument nor cites any legal authority supporting it.  *See Galiant Homes, LLC v. Herlik*, 2025 COA 3, ¶ 14 ("We . . . will not 'consider undeveloped and unsupported arguments.'" (quoting *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12)).